UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| V. | : | |
| MAURICE MILLIGAN, | : | CASE NO. 3:09-CR-246(RNC) |
| Defendant. | : | |

RULING AND ORDER

The defendant is charged in a single-count indictment with possession of ammunition in violation of 18 U.S.C. § 922(g)(1). The ammunition was found during a search of the defendant's car following a traffic stop in New London. The defendant has moved to suppress the ammunition on the ground that the stop and search violated his rights under the Fourth Amendment. An evidentiary hearing has been held and the parties have submitted post-hearing briefs.

The government contends that the motion to suppress should be denied because the defendant made a turn without signaling, which justified a traffic stop, then voluntarily consented to a search of the car, which led to a lawful seizure of the ammunition. I agree with the government that the stop was permissible because probable cause objectively existed on the basis of the unsignaled turn. I also find that the duration and scope of the stop did not exceed constitutional limits. I cannot agree, however, that the search was lawful.

It is undisputed that the search took place after an officer

told the defendant an inventory search had to be done. The government's post-hearing memorandum seems to suggest that a lawful right to conduct an inventory search existed. But the government does not rely on the exception to the warrant requirement permitting inventory searches, or on the inevitable discovery exception, which can be invoked when police have a lawful right to conduct an inventory search of a vehicle. Instead it seeks to sustain the search on the basis of the defendant's consent alone.

The issue, therefore, is whether the government has met its burden of proving that the defendant voluntarily consented to the search. After careful consideration, I find that the government has not sustained its burden. Based on the evidence presented at the evidentiary hearing, the defendant appears to have acquiesced to the officer's claim of lawful authority to conduct an inventory search when such authority did not exist. Because the defendant's consent is the only basis on which the government seeks to justify the warrantless search, it must be concluded that the search violated the Fourth Amendment.

"[S]uppression is not an automatic consequence of a Fourth Amendment violation." Herring v. United States, ___ U.S. ___, 129 S.Ct. 695, 698 (2009). Whether suppression is a proper remedy requires consideration of "the culpability of the police and the potential of exclusion to deter wrongful conduct." Id.

A violation having been found, the parties will be given an opportunity to submit briefs on the issue whether the exclusionary rule should be applied.

I. Facts

The following findings of fact are based on the evidence presented at the hearing.[1] In 2009, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") conducted a wiretap investigation of drug trafficking in New London County. Two targets of the investigation, Marcus Colvin and Donald Gatlin, lived at 481 Williams Street in New London. An ATF surveillance camera was set up across the street from their residence to enable investigators to keep track of activity in the area.

On September 6, 2009, at about 8:30 p.m., an officer monitoring the surveillance camera saw a car pull up and park in front of 481 Williams Street. ATF Special Agent Daniel Prather thought the car might belong to the defendant, who was known to associate with Gatlin.[2] Because Gatlin was not home at the time, Prather wondered whether the defendant was meeting with Colvin in connection with drug trafficking.

Prather contacted New London Police Officer Brian Laurie to

---

[1] Three witness testified for the government. The defendant did not testify and called no witnesses of his own.

[2] Based on intercepted telephone calls between the defendant and Gatlin, the defendant had been listed as a violator and interceptee in a wiretap application.

request surveillance of the car. Laurie had been cross-designated as an ATF task force officer and was working on the wiretap investigation full-time. In response to Prather's request, Laurie drove to 481 Williams Street in an unmarked car. He recognized the car parked in front of the residence as one he had seen operated by the defendant and proceeded to maintain surveillance of the area. About fifteen minutes later, he saw the defendant leave the residence, enter the car parked in front and drive away. An officer monitoring the surveillance camera observed that the defendant appeared to be carrying a backpack or duffel bag.[3]

Laurie followed the defendant's car as it departed the area and immediately contacted his colleague, New London Police Officer James Suarez. Suarez also worked on the wiretap investigation as an ATF task force officer but was on patrol duty that night in a marked cruiser in his capacity as a local police officer. Laurie informed Suarez that he needed assistance in stopping a car that had just left 481 Williams Street. Laurie described the defendant's car and its location. Suarez correctly understood that Laurie wanted him to follow the defendant's car for the purpose of finding a motor vehicle violation to justify a traffic stop, which, in turn, could potentially lead to a search

---

[3] Whether this officer's observation was communicated to Laurie is unclear.

of the vehicle for narcotics.

Laurie followed the defendant's car until Suarez caught up to them, which took a few minutes.  When Suarez arrived, Laurie fell back to enable Suarez to position his cruiser directly behind the defendant's car.  Laurie then continued to follow both vehicles at a distance.

Soon after Suarez began following the defendant, the defendant turned right at the intersection of Hawthorne Drive and Ridgeview Circle without signaling.  Suarez immediately recognized that the defendant's failure to signal violated the motor vehicle code and he notified Laurie.  The defendant continued a short distance on Ridgeview Circle until it intersected again with Hawthorne Drive, at which point he turned left and proceeded toward his residence, which was located nearby at 115 Hawthorne Drive.  This time he signaled before turning. Suarez activated his siren and flashing lights causing the defendant to pull over.  The place where the defendant stopped was close to his driveway.

Suarez approached the defendant who remained seated in his car.  They recognized each other.  Suarez asked the defendant for his license, registration and insurance card.  The defendant produced a New York driver's license, a Connecticut identification card and an insurance card.  The defendant told Suarez he had recently purchased the car and the previous owner

was allowing him to use the old plates until he could get the car registered. Suarez noticed that the insurance card was expired and asked the defendant if he had another one. The defendant said he did not.

At about this time, Laurie appeared at the scene of the stop wearing civilian clothes.[4] The defendant was asked to get out of the car and join the officers at the rear of the car, which he did. Laurie interacted with the defendant by asking him general questions. The defendant was calm and cooperative. Whether the defendant was placed in handcuffs is unclear.[5]

After conducting a brief check to determine whether the defendant had a Connecticut driver's license, Suarez announced that because the car was not properly registered or insured, it would have to be towed. The defendant asked if he could simply put the car in his driveway. Suarez replied that he could not allow the defendant to move the car. At about this time, New London Police Officer Marcaccio arrived in her cruiser. Like Suarez, she was in uniform.[6]

---

[4] Laurie did not want his car to be seen by the defendant so he parked about 100 yards from the location of the stop and walked the rest of the way.

[5] Laurie testified that the defendant may have been placed in handcuffs as is commonly done for officer safety. Suarez testified that handcuffs were not used, although he regarded the defendant as potentially dangerous.

[6] The defendant contends on the basis of certain police records that other New London police officers also appeared at

6

Laurie told the defendant the car would have to be inventoried before it was towed. Immediately after informing the defendant that an inventory search had to be done, Laurie asked the defendant if he would have any problem with the officers searching the car. The defendant responded that the officers could go ahead.

I find that the defendant did not object to the search because of Laurie's statement that an inventory search had to be done. Crucial to this finding is the undisputed fact that the defendant had refused to permit Officer Laurie to search his car on a prior occasion. In early 2009, Laurie encountered the defendant while investigating complaints of drug-related activity at a location on Garfield Avenue in New London, where the defendant lived at the time. When Laurie arrived at that location, he saw the defendant leaving the parking lot in his car. Laurie asked the defendant to stop and the defendant did so. Laurie introduced himself, spoke with the defendant briefly, then asked if there was anything illegal in the car. The defendant responded, "No." Laurie then requested permission to search the car. The defendant refused to permit a search and

---

the scene of the stop before his car was searched. I credit the testimony of the government's witnesses that these other officers were not present and find that the records relied on by the defendant are inaccurate. The evidence indicates that two more law enforcement officers subsequently appeared on the scene (a New London police sergeant and a DEA agent) but they arrived after the events at issue.

7

none was conducted. A key difference between these two encounters is Laurie's statement on the occasion at issue in this case that the car had to be inventoried. Were it not for Laurie's statement, I doubt the defendant would have permitted the search.

Laurie proceeded to remove a duffel bag from the passenger compartment of the car. Laurie asked the defendant if he would have any problem with the officers searching the bag. Again the defendant acquiesced. Laurie placed the bag on the trunk of the car, unzipped the bag and removed its contents. The bag contained empty shell casings and ammunition, among other items.[7] Laurie knew the defendant had a felony record and believed his possession of the shell casings and ammunition violated federal law. Accordingly, he kept these items as evidence and put the other items back in the bag.[8]

While the search was underway, Officer Suarez prepared a a summons citing the defendant for failing to signal, operating a vehicle without proper registration or insurance, and operating

---

[7] Also found inside the bag were antique coins and "sex toys."

[8] The defendant challenges the seizure of the ammunition on the ground that local police officers lack authority to seize items for possible use as evidence in a federal prosecution when possession of the items does not violate state or local law, citing United States v. Haskin, 228 F.3d 151 (2d Cir. 2000). It is undisputed, however, that Laurie seized the ammunition while acting in his capacity as a federal task force officer.

8

a vehicle without a Connecticut driver's license, which the defendant was required to have because he had been a resident of the state for more than six months. Suarez also arranged to have the car towed.

After the search was completed, the defendant asked if he could put his duffel bag and other belongings in his house. Suarez agreed. The defendant then transferred his personal property to his house before the tow truck arrived. No inventory of the contents of the car was prepared. It is unclear where the car was taken after it was towed.[9]

II. Discussion

   A. The Traffic Stop

The defendant challenges the traffic stop on the ground that it lacked probable cause. More specifically, he contends that the "Y-shaped" intersection of Hawthorne Drive and Ridgeview Circle where he failed to signal is configured in such a way that no signal is required when moving to the right. The government contends that a signal is required. The government's position is supported by the evidence.

Under Connecticut law, a driver must signal when turning at an intersection. See CONN. GEN. STAT. § 14-242. An "intersection" is defined as an area where "two or more highways join one

---

[9] Officer Suarez testified that he told the defendant to wait at the scene in order to tell the tow truck driver where he, the defendant, wanted the car to be towed.

9

another at an angle." CONN. GEN. STAT. § 14-212. The evidence establishes that Hawthorne Drive and Ridgeview Circle intersect at nearly a right angle where the defendant turned without signaling. The stop was therefore supported by probable cause.

Under Whren v. Unites States, 517 U.S. 806 (1996), an observed traffic violation justifies a stop regardless of the officer's subjective motives. The pretextual nature of the stop in this case thus provides no support for the defendant's claim that the stop violated his rights under the Fourth Amendment. See United States v. Stewart, 551 F.3d 187, 193 (2d Cir. 2009); Holeman v. City of New London, 425 F.3d 184, 190 (2d Cir. 2005); United States v. Dhinsa, 171 F.3d 721, 725 (2d Cir. 1998).[10]

The defendant contends that Officer Laurie's involvement in the stop extended its duration and scope beyond constitutional limits. The Fourth Amendment does not require an individual stopped for a traffic violation to be released at the earliest possible moment, however. See United States v. Harrison, 606 F.3d 42, 45 (2d Cir. 2010). And the Supreme Court recently decided that "[a]n officer's inquiries into matters unrelated to the justification for [a] traffic stop . . . do not convert the

---

[10] The Government contends that the stop of the defendant's car also was justified by reasonable suspicion that he was engaged in narcotics trafficking. The defendant urges that such reasonable suspicion was lacking. I agree with the defendant that the information known to the officers did not provide reasonable suspicion that the defendant was transporting contraband.

10

encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, ___ U.S. ___, 129 S.Ct. 781, 788 (2009).

Here, the evidence establishes that Laurie raised the subject of searching the car on the heels of Suarez's announcement that the car would have to be towed. At that point, only about five minutes had elapsed since the stop was initiated and Suarez still needed to prepare the summons and arrange for the tow. The defendants's challenge to the duration and scope of the stop is therefore unavailing.

B. The Search

Under the Fourth Amendment, police may conduct a search without a warrant or probable cause if consent is given by a person with authority to grant consent. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Consent must be voluntary and "not the result of duress or coercion." Id. at 249. When the government relies on consent to validate a search, it bears the "burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). "Voluntariness is a question of fact to be determined from all the circumstances." See Schneckloth, 412 U.S. at 227.[11]

---

[11] Factors weighed in determining the issue of voluntariness include the length and circumstances of any detention of the individual before consent was given; whether the

11

In this case, the government has not met its burden of demonstrating that consent was voluntarily given. The defendant correctly contends that the circumstances in which he was detained were somewhat coercive. Even so, he could give voluntary consent to the search if he was able to exercise a free choice. See United States v. Vasquez, 638 F.2d 507, 524 (2d Cir. 1980). "Freedom of choice is deemed non-existent, however, if the officers have claimed official authority to conduct the search." Id., citing Bumper, 391 U.S. at 548. "And if the individual has merely acquiesced in a show of authority, he should not be found to have consented." Vasquez, 638 F.3d at 524; see also United States v. Sanchez, 635 F.2d 47, 59 (2d Cir. 1980)(when law enforcement agents represent that they have authority to search whether or not defendant consents, permissive statement by defendant cannot be deemed voluntary consent); United States v. Ruiz-Estrella, 481 F.2d 723, 728 (2d Cir. 1973)(when government shows no more than acquiescence to apparent lawful authority, theory of consent cannot be accepted).

It is undisputed that Officer Laurie told the defendant the car had to be inventoried before it was towed. A reasonable

---

police engaged in coercive tactics; the extent to which the individual knew and understood his rights, including the right to withhold consent; the degree to which the individual cooperated; and the individual's age, education and intelligence. See Schneckloth, 412 U.S. at 226-27; United States v. Yu-Leung, 51 F.3d 1116, 1119 (2d Cir. 1995).

person in the defendant's position would understand Officer Laurie's statement to mean that the officers had a duty to inventory the contents of the car and the defendant had no right to resist.  If the officer's statement was well-founded, it would not necessarily preclude voluntary consent.  See United States v. Faruolo, 506 F.2d 490, 495 (2d Cir. 1974).  But police act at their peril when, in attempting to obtain consent to a search, they claim to have a right to search without consent.  See WAYNE R. LAFAVE, 4 SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT §8.2(c), p. 74 (4th ed. 2004).  It is important to determine, therefore, whether the officers had lawful authority to conduct an inventory search of the contents of the defendant's car.  See Davis v. Novy, 433 F.3d 926, 931 (7th Cir. 2006).

Inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger."  Colorado v. Bertine, 479 U.S. 367, 372 (1987).  It is well-established that an inventory search must be conducted pursuant to standardized criteria and procedures designed to produce an inventory of the vehicle's contents.  See Florida v. Wells, 495 U.S. 1, 4-5 (1990); United States v. Lopez, 547 F.3d 364, 371 (2d Cir. 2008); United States v. Mendez, 315 F.3d 132, 1376 (2d Cir. 2002).  Law enforcement agencies are required to regulate inventory searches in this manner in order

13

to reduce the risk that such searches will be used by individual officers as a pretext to conduct general searches for evidence of crime. See Wells, 495 U.S. at 4; Lopez, 547 F.3d at 370; Mendez, 315 F.3d at 137.

The government has not shown that the New London Police Department had a policy regulating inventory searches at the time in question.[12] At the evidentiary hearing, which took place over two days, the government asked no questions of Officer Suarez or Officer Laurie regarding such a policy. The only evidence on the subject was elicited by defendant's counsel during cross-examination of Officer Suarez:

> Q: Do you recall Officer [Laurie] telling Mr. Milligan before he allowed [the] vehicle to be searched that the vehicle was going to be towed and inventoried?
>
> A: I'm not sure. I believe so. I remember he was talking to him about it being towed.
>
> Q: And that they were going to inventory the contents?
>
> A: He could have. Most likely he would have. Most cops do that.
>
> Q: And in any event, at the time in question in September of 2009, there was no written New London Police Department policy about when and how to conduct an inventory on a motor vehicle stop, was there?
>
> A: An inventory is when we take it in the impound, usually before we tow a car we'll do a cursory search for valuables

---

[12] While the government is not required to provide a copy of a written policy, it must establish through testimony or other evidence that a standardized policy existed. See Lopez, 547 F.3d at 369-71.

14

so they don't say there was a thousand dollars in the car.

Q: My question, sir, is there, at the time, there was no written policy from the New London Police Department concerning that very issue, was there?

A: I'm not sure. I think it was between.

Tr. 124-25.

On this record, it is impossible to find that the Department had a policy providing adequate regulation of inventory searches at the pertinent time. In the absence of such a policy, the officers lacked lawful authority to conduct an inventory search of the contents of the car. Because lawful authority to inventory the contents of the car has not been shown to exist, Officer Laurie's statement that an inventory had to be done must be regarded as a misrepresentation.[13]

This case is analogous to Bumper, where police searched a home after announcing they had a warrant. As the Supreme Court observed, the situation in Bumper was "instinct with coercion." Id. at 550. The officers "announce[d] in effect that the occupant ha[d] no right to resist the search." Id. Without the occupant's voluntary consent, however, a lawful search could not

---

[13] In its post-hearing memorandum, the government states, "given that it was common practice for New London officers to conduct an inventory search of items left in a car prior to impounding a vehicle, it might have been unreasonable for Officer Laurie not to inform the defendant of such." Id. at 10, n. 9. But the government made no attempt at the evidentiary hearing to establish the existence of such a common practice and the record does not support a finding that such a common practice actually existed.

15

be conducted.[14]

The same can be said of the situation shown by the record here. Officer Laurie's statement that the car had to be inventoried appeared to leave the defendant with no choice in the matter. The car's contents were going to be inventoried whether he liked it or not. Yet, as far the record shows, the officers had no right to make such a thorough search unless the defendant voluntarily consented.[15]

In endeavoring to show that the defendant voluntarily consented, notwithstanding Officer Laurie's statement, the government places great weight on the officers' testimony regarding the defendant's words and demeanor. Officer Laurie testified that when the defendant was asked whether he would have any problem with the officers searching the car, the defendant responded, "Absolutely not." Officer Laurie similarly testified that when he removed the duffel bag from the car and asked the defendant if he would have any problem with the officer searching it, the defendant responded, "Absolutely not." Asked if he could

---

[14] In Bumper, a warrant existed but the government made no attempt to show that the warrant authorized the search.

[15] The government relies on an unpublished opinion of the Tenth Circuit rejecting a Bumper claim by a defendant who consented to a search of his car in response to an officer's statement that the car would have to be impounded and inventoried. United States v. Clasen, No. 97-41449, 1998 WL 544332, ay *3 (10th Cir. Aug. 26, 1998). In that case, however, the Court determined that the officer had lawful authority to impound the car and conduct an inventory search. Id. at *4.

16

recall the defendant's "exact words," the officer testified: "I believe I asked him: Would you mind? He said: Absolutely, go ahead. I mean, he was very low key, very cooperative, like I said." Tr. 175.

Having paid close attention to the testimony when it was given, and having considered it carefully in light of the entire record, I find that the words "Absolutely not" and "Absolutely, go ahead" are Officer Laurie's words, not the defendant's. Even if the officer was giving a verbatim account, the defendant's use of these words in a "very low key, very cooperative" manner does not support a finding that he voluntarily consented. Viewed realistically and in context, the defendant's words and demeanor reflected his acceptance of the officer's authority to conduct an inventory search. Such acquiescence to a false claim of lawful authority does not constitute voluntary consent.[16]

The government also places great weight on the defendant's previous refusal to consent to a search of his car when confronted by the same officer. In determining whether an individual's consent was voluntarily given, the individual's refusal to consent on a previous occasion can have significant

---

[16] Officer Suarez testified that he heard the defendant tell Officer Laurie, "I don't mind at all, go ahead." According to Officer Suarez, the defendant also told him it was "not a problem." See Tr. 102, 143. I find the defendant's words and conduct, as described by Officer Suarez, consistent with acquiescence to Officer's Laurie's claim of lawful authority.

17

probative value.  But Officer Laurie made no claim of lawful authority to conduct a search on the prior occasion.  At that time, when no such claim was made, the defendant refused to permit a search.  At the time in question, when he was confronted with such a claim, he acquiesced.

The government contends that a finding of voluntary consent is justified because the defendant knew he had a right to refuse the search and voiced no objection.  The record does not support a finding that the defendant knew he had a right to object.  The officers gave him no reason to think he had such a right and there is no basis for inferring that he was aware of such a right as a result of prior education and experience.

The other circumstances relied on by the government do not demonstrate that consent was voluntarily given.  The defendant's calm demeanor and his cooperation with the officers are consistent with an attitude of submission to lawful authority.  They do not support a finding that he would have permitted a search independently of Officer Laurie's statement that an inventory had to be done.

Based on the totality of the circumstances, I find that the thorough search of the defendant's car and its contents cannot be justified on the basis of voluntary consent.  Because voluntary consent has not been shown, I conclude that the search violated the Fourth Amendment.

C.  The Exclusionary Rule

A violation of the Fourth Amendment having been found, it is necessary to determine whether suppression is a proper remedy. See Herring v. United States, ___ U.S. ___, 129 S.Ct. at 700 (2009).  The parties have not addressed this issue.  The interests of justice will be served if they are given an opportunity to do so.  The government will have until May 24, 2011, to file a brief.  The defendant's brief will be due 14 days after the government's brief is filed.

III. Conclusion

The defendant's motion to suppress (Doc. 18) is hereby granted insofar as it seeks a determination that the search violated the Fourth Amendment.  A decision on whether suppression is a proper remedy for this violation will be made after the parties file their briefs.

So ordered this 4th day of May 2011.

/s/ RNC
Robert N. Chatigny
United States District Judge